## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

VICTORIA WILCOX, individually and
on behalf of all others similarly situated,

Plaintiff,

- against -

TARGET CORPORATION,

Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff Victoria Wilcox ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.   CONSUMER AVOIDANCE OF ARTIFICIAL FLAVORS

1.   According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[1]

2.   Recent surveys report that over eighty percent of Americans believe that foods with artificial flavor are less healthy than those with only natural flavors.

3.   According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

4.   The trade journal, Perfumer & Flavorist, described "The Future of

---

[1] Lauren Manning, How Big Food is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[2]

5.  Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[3]

6.  Surveys by Nielsen, New Hope Network, and Label Insight concluded that between sixty and eighty percent of the public tries to avoid artificial flavors.

## II.  LEGAL BACKGROUND

7.  Over 100 years ago, consumers were similarly concerned about what was in the foods they bought for their families which made them taste good.

8.  However, these chemical additives were often untested, dangerous and not disclosed to purchasers.

9.  In response to that unregulated environment where synthetic molecules were manufactured in laboratories and substituted for the ingredients promoted on food packaging, the Pure Food and Drug Act of 1906 established laws to ensure the public they would get what they paid for.

---

[2] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.

[3] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

10. These requirements were strengthened when Congress adopted the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

11. Florida adopted these laws through the Food Safety Act ("FSA") and accompanying regulations. Fla. Stat. § 500.01 *et seq.*; Fla. Stat. § 500.02(2) ("Provide legislation which shall be uniform, as provided in this chapter, and administered so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the [FFDCA]."); FL Admin Code § 5K-4.002(1)(d) (adopting 21 C.F.R. Parts 101 and 102).[4]

12. The newly established Food and Drug Administration ("FDA") was aware of how companies used advanced scientific knowledge to substitute dangerous and unhealthy flavoring chemicals in place of the more valued and promoted ingredients like fruit and fruit flavor.

13. Beyond the potential to cause physical harm, these synthetic substances were significantly cheaper than the highlighted ingredients and their natural flavoring compounds they replaced.

14. To facilitate an honest marketplace and protect consumers, the rules required that whenever "[a] label, labeling, or advertising of a food makes any direct or indirect representations with respect to [a] primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means," it is considered its

---

[4] Georgia has adopted the identical federal laws.

"characterizing flavor," and its source, whether natural or artificial, must be disclosed to consumers. 21 C.F.R. § 101.22(i)(1).

15.    According to one scholar, this rule "is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[5]

16.    To reach this goal, the FDA defined a flavor as a substance which imparts taste. 21 C.F.R. §§ 101.22(a)(1) and (3).

17.    Then, it defined natural flavor as the "essential oil, oleoresin, essence or extractive" from fruits or vegetables, "whose significant function [] is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

18.    In contrast to natural flavors, artificial flavor referred to "any substance, the function of which is to impart flavor" from synthetic or chemical sources. 21 C.F.R § 101.22(a)(1).

19.    These laws consider a food "misbranded" and misleading if its labeling is false or misleading in any particular. 21 U.S.C. § 343(a); Fla. Stat. § 500.11(1)(a).

20.    A food can be "misbranded" is if it fails to indicate a "common or usual name." 21 U.S.C. § 343(i); Fla. Stat. § 500.11(i)(1).

21.    The "common or usual name" is required "accurately identif[y] or

---

[5] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

describe[s], in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." 21 C.F.R. § 102.5(a).

22.   Relevant to a food's common or usual name was the source of its taste, based on which ingredients were promoted on the packaging. 21 C.F.R. § 101.22(i).

23.   Since research showed how "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging to evaluate [any] product," thereby "develop[ing] sensory expectations" about taste and the source of that taste, the FDA requires.[6]

24.   To ensure purchasers were not misled by foods promoted as having only natural flavors when they contained unnatural, synthetic, artificial flavors, the FDA defined these terms to promote an honest marketplace.[7]

## III.  FLAVOR OF APPLES

25.   Taste is a combination of sensations arising from specialized receptor cells in the mouth.[8]

---

[6] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

[7] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

[8] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).

26.   Taste is defined as sensations of sweet, sour, salty, bitter, and umami.

27.   Taste is complex, because, for instance, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

28.   Each of those acids is responsible for unique sensory characteristics of sourness.

29.   Fruit flavors, including apple flavor, are the sum of the interaction between their nonvolatile compounds, such as sugars and organic acids, and volatile compounds, including aromatic hydrocarbons, aldehydes, ketones and esters.

30.   The prototypical apple taste is based on the interaction of its free sugars, glucose and fructose, with its predominant organic acids of malic acid and second predominant acids of tartaric acid and fumaric acid, to create its unique tart, sour, slightly sweet and/or fruity flavor.[9]

31.   Malic acid constitutes 95% of the organic acids present in apples.

| Fruit | First Predominant Acids | Second Predominant Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Chili Peppers (habanero) | Citric Acid | Malic Acid, Succinic Acid |

_____

[9] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

| | | |
|---|---|---|
| Coconut | Malic Acid | Citric Acid |
| Dragon fruit | Malic Acid | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Kiwi | Quinic Acid, Citric Acid | Malic Acid |
| Lemon | Citric Acid | Malic Acid |
| Lime | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

32.   The amount and proportion of malic acid in apples is critical to development of its characteristic tart, sour and sweet taste valued by consumers.

33.   Malic acid is often referred to as "apple acid," with the word malic derived from the Latin mālum, for which Malus, the genus that contains all apple species, is named.

## IV.   DESPITE PROMOTING NATURAL FLAVORS, PRODUCT'S TASTE IS FROM ARTIFICIAL FLAVORING

34.   According to Paul Manning, CEO and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging

trend."[10]

35.   To capture this trend, Target Corporation ("Defendant") sells cereal bars which purport to be filled with apples, cinnamon and natural flavoring under its Market Pantry brand ("Product").



36.   The labeling is false and misleading because despite the statements of "Naturally Flavored Apple Cinnamon [Soft Baked Breakfast Bars]" and "Made With Real Fruit Filling," a green stripe at the bottom of the package and pictures of three

---

[10] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

fresh green apple slices and two cinnamon sticks, it contains artificial flavoring ingredients to simulate, resemble and reinforce its apple taste.

37.   While the ingredient list in fine print on the back or side panel indicates the fruit filling contains apples and natural flavor, it also includes malic acid.



**INGREDIENTS:** CRUST (WHOLE OAT FLOUR, ENRICHED BLEACHED FLOUR…LIQUID WHOLE EGGS), APPLE AND CINNAMON FLAVORED FILLING (SUGAR, WATER, APPLE PUREE, GLYCERIN, CORN SYRUP, MALTODEXTRIN, APPLE POWDER, PECTIN, CINNAMON, XANTHAN GUM, MALIC ACID, CITRIC ACID, SODIUM ALGINATE, DICALCIUM PHOSPHATE, SODIUM CITRATE, MONO & DIGLYCERIDES, ASCORBIC ACID – A PRESERVATIVE, POTASSIUM SORBATE – A PRESERVATIVE, CALCIUM STEARATE, NATURAL FLAVOR).

A. Malic Acid

38.   Malic acid has two isomers, or arrangements of atoms, L-Malic Acid and D-Malic Acid. 21 C.F.R. § 184.1069.

39.   These are right and left-hand versions of the same molecular formula.[11]

---

[11] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).



40.  L-Malic Acid occurs naturally in apples and is responsible for its tart, sour and sweet taste.

41.  D-Malic Acid does not occur naturally anywhere.

42.  D-Malic Acid is found as a racemic mixture of the D and L isomers, or DL-Malic Acid.

43.  The production of DL-Malic Acid begins with petroleum.

44.  It involves a catalytic process with numerous chemical reactions, including heating maleic anhydride with water under extreme pressure at 180°C.

45.  This results in an equilibrium mixture of malic and fumaric acids.

46.  The soluble fumaric acid is filtered off and recycled, and the synthetic, or DL-, malic acid is concentrated and crystallized.

B.  Distinguishing L- from DL- Malic Acid

47.  Since the two types of malic acid are closely related, unscrupulous companies may replace naturally occurring L-Malic Acid with the lower cost and synthetic DL-Malic Acid.

48.   However, the scientific community has developed methods to detect this kind of adulteration.

49.   According to Wilhelmsen, this type of adulteration involving the direct addition of foreign substances, like DL-Malic Acid, can easily be detected.[12]

50.   This requires well-defined detection limits, a sufficiently validated detection method and the knowledge the adulterant and/or its marker are not found in the food product.

51.   Any confirmed detection will be indicative of adulteration, without complicated statistical or other analysis.

52.   Since plants do not synthesize D-Malic acid, its presence above established thresholds generally indicates synthetic malic acid has been added.

53.   The most accepted method used to determine if a food contains DL-Malic Acid is based, in part, on a standard adopted by the European Union for the enzymatic determination of the total content of D-malic acid in fruit juices and related products. EN 12138:1997.

54.   This enzymatic approach is based on D-malate dehydrogenase ("D-MDH"), an enzyme that oxidizes D-malic acid ("D-malate") to pyruvate and carbon dioxide in the presence of an appropriate cofactor.

---

[12] Eric C. Wilhelmsen, "Food Adulteration," in Food Science and Technology, Marcel Dekker (2004).

55. D-malate is oxidized by nicotinamide adenine dinucleotide ("NAD") to oxaloacetate, pictured in the below diagram.

$$\text{D-malate} + \text{NAD} \xrightarrow{\text{+ D-MDH}} \text{pyruvate} + CO_2 + NADH + H^+$$

56. The oxaloacetate formed by this reaction is split into pyruvate and carbonic acid.

57. The quantity of NADH formed is proportional to the concentration of D-malic acid and measured at a wavelength of 334, 340 or 365 nm.

58. Laboratory analysis of the Product's fruit filling was performed based on this enzymatic method in accordance with accepted industry standards and protocols.

59. Applying D-MDH, D-Malic acid was preferentially oxidized over L-Malic acid.

60. The result was that the synthetic D-isomer of malic acid was identified, indicating the Product used artificial, DL-Malic Acid and not L-Malic Acid.

61. The combination of DL-Malic Acid with the free sugars from apples is not equivalent to the taste of apples and natural flavors.

62. The addition of DL-Malic Acid imparts, creates, simulates, resembles and/or reinforces the characteristic tart, sweet and sour taste that apples are known for.

63. DL-Malic Acid is not a "natural flavor" as defined by federal and state

regulations, because it is not from a fruit, vegetable, or other natural source, but from petroleum, made through chemical reactions.

64.   DL-Malic Acid is an artificial flavoring ingredient.

65.   DL-Malic Acid does not supplement, enhance, or modify the original taste of apples, because it is the core component of its taste. 21 C.F.R. § 170.3(o)(11).

66.   The Product could have included more of the highlighted fruit ingredient of apples, L-Malic Acid from apples or more natural flavoring from sources other than apples but used artificial DL-Malic Acid because it cost less and/or more accurately imparted, provided, simulated, resembled, and reinforced the taste of apples.

## V.   "NATURALLY FLAVORED" DESCRIPTION IS MISLEADING

67.   The Product's "common or usual name" of "Naturally Flavored Apple Cinnamon Soft Baked Breakfast Bars" is misleading because it does not "accurately identif[y] or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." 21 C.F.R. § 102.5(a); FL Admin Code § 5K-4.002(1)(d).

68.   This is because this "common or usual name" fails to accurately disclose the source of the apple taste, in accordance with federal and state requirements. 21 C.F.R. § 101.22(i).

69.   The Product's "common or usual name" omits the presence of artificial

flavoring, based on the presence of DL-Malic Acid, which imparts the taste of apples. 21 C.F.R. § 101.22(i)(2).

70.   The result is that the Product is "misbranded" and misleads consumers to expect the filling's taste is only from the identified ingredients of apple and cinnamon and natural flavors, which is false, because its taste comes in part from the artificial flavoring ingredient of DL-Malic Acid.

71.   Federal and state regulations require that because the apple cinnamon cereal bars contain DL-Malic Acid that imparts the flavor of apples, "Apple Cinnamon" is required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Apple Cinnamon Flavored" or "Artificially Flavored Apple Cinnamon." 21 C.F.R. § 101.22(i)(2).

72.   By adding the synthetic ingredient of DL-Malic Acid, purchasers do not receive a product that it "Naturally Flavored," but one that is artificially flavored.

73.   By adding the synthetic ingredient of DL-Malic Acid, purchasers get a smaller amount of apple and natural flavors than what is promised by the front label.

74.   Consumers buying fruit filled cereal bars labeled as naturally flavored, with pictures of the ingredients that supply the taste of its filling, such as apples and cinnamon, yet omitting any reference to how artificial flavoring is responsible for the filling's taste, are seeking to avoid synthetic ingredients like DL-Malic Acid, created in a laboratory.

## VI.  CONCLUSION

75.   As a result of the false and misleading representations and omissions, the Product is sold at a premium price, approximately $2.59 for 8 bars, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<strong>JURISDICTION</strong>

76.  Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

77.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

78.   Plaintiff is a citizen of Florida.

79.   Defendant is a citizen of Minnesota based on its corporate formation.

80.   Defendant is a citizen of Minnesota based on its principal place of business.

81.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

82.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at the approximately 127 Target stores in this State and online to citizens of this State.

83.   The Court has jurisdiction over Defendant because it transacts business

15

within Florida and sells the Product to consumers within Florida from the approximately 127 Target stores in this State and online to citizens of this State.

84.   Defendant transacts business in Florida, through the sale of the Product to citizens of Florida from the approximately 127 Target stores in this State and online to citizens of this State.

85.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

86.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

87.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

**VENUE**

88.   Venue is in this District with assignment to the Orlando Division because a substantial part of the events or omissions giving rise to these claims occurred in Volusia County, which is where Plaintiff's causes of action accrued.

89.   Plaintiff purchased, paid money for or towards, used and/or consumed the Product in reliance on the representations and omissions identified here in Volusia County.

90.   Plaintiff first became aware the representations and omissions were false and misleading in Volusia County.

91.   Plaintiff resides in Volusia County.

**PARTIES**

92.   Plaintiff Victoria Wilcox is a citizen of Volusia County, Florida.

93.   Defendant Target Corporation is a Minnesota corporation with a principal place of business in Minnesota.

94.   Target is an American multinational retail corporation that operates almost 2,000 big box retail stores throughout the nation, selling everything from furniture to electronics to groceries.

95.   While Target sells leading national brands of products, it also sells many products under one of its private label brands, Market Pantry.

96.   Private label products are made by third-party manufacturers and sold

under the name of the retailer, or its sub-brands.

97.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

98.   Products under the Market Pantry brand have an industry-wide reputation for quality.

99.   In releasing products under the Market Pantry brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

100.   Market Pantry gets national brands to produce its private label items due its loyal customer base and tough negotiating.

101.   Private label products under the Market Pantry brand benefit by their association with consumers' appreciation for the Target brand overall.

102.   That Market Pantry-branded products met this high bar was or would be proven by focus groups, which rated them above their name brand equivalent.

103.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Market Pantry] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

104.   Private label products generate higher profits for retailers like Target because national brands spend significantly more on marketing, contributing to their

higher prices.

105. The development of private label items is a growth area for Target, as they select only top suppliers to develop and produce Market Pantry products.

106. Plaintiff is like most consumers and prefers foods with natural ingredients and natural flavors.

107. Plaintiff is like most consumers and tries to avoid foods with artificial flavors, based on the belief they are potentially harmful, not natural and unhealthy.

108. Plaintiff is like most consumers and looks to the front label of foods to see what she is buying and to learn basic information about it.

109. Plaintiff is like most consumers and is accustomed to the front label of packaging telling them if what they are buying gets its taste from artificial flavoring.

110. Plaintiff is like most consumers and when she sees that a front label does not disclose artificial flavoring, she expects its taste is from the identified ingredients and/or natural flavoring.

111. Plaintiff is like most consumers and when she sees a label that tells her a food is "Naturally Flavored," she does not expect its taste to be from artificial flavoring and/or that it will not contain artificial flavoring ingredients.

112. Plaintiff read, saw and relied on the label's statements of "Naturally Flavored Apple Cinnamon Soft Baked Breakfast Bars," "Made With Real Fruit Filling," the green stripe at the bottom of the package and pictures of three fresh

green apple slices and two cinnamon sticks to expect the Product's filling got its taste from the identified ingredients of apple and cinnamon and natural flavoring.

113. Plaintiff relied on the omission of artificial flavoring from the front label as it related to the taste of the Product's filling.

114. Plaintiff did not expect that in addition to apples and natural flavor, the Product would use added artificial flavoring in the form of the synthetic compound of DL-Malic Acid to provide its apple taste.

115. Plaintiff did not expect that the Product would use DL-Malic Acid in place of adding more apples and natural flavoring.

116. Plaintiff purchased the Market Pantry Naturally Flavored Apple Cinnamon Soft Baked Breakfast Bars with the labeling identified here at Target stores in Volusia County and/or other counties in Florida between November 2019 and November 2023.

117. Plaintiff bought the Product at or exceeding the above-referenced price.

118. Plaintiff paid more for the Product than she would have had she known its fruit filling's taste was from artificial flavoring instead of only from the highlighted ingredients and natural flavorings, as she would have paid less.

119. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

20

## CLASS ALLEGATIONS

120. Plaintiff seeks to represent the following class:

> All persons in Florida who purchased the
> Product in Florida during the statutes of
> limitations for each cause of action alleged.

121. Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

122. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

123. Plaintiff is an adequate representative because her interests do not conflict with other members.

124. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

125. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

126. The class is sufficiently numerous and likely includes several hundred thousand people.

127. This is because Defendant operates 127 stores in the States Plaintiff is seeking to represent, which serve a population of over 20 million people.

128. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. § 501.201, *et seq.*

129. Plaintiff incorporates by reference paragraphs 1-64.

130. The purpose of FDUTPA is to protect consumers against unfair and deceptive practices.

131. This includes "making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

132. The labeling of the Product violated FDUTPA because the representations and omissions its filling's taste was only from the identified ingredients of apples, cinnamon and natural flavorings, when it contained added artificial flavoring in the form of DL-Malic Acid, was unfair and deceptive to consumers. Fla. Stat. § 501.204(1).

133. The labeling of the Product violated FDUTPA because the representations and omissions its filling's taste was only from the identified ingredients of apples, cinnamon and natural flavorings, when it contained added artificial flavoring in the form of DL-Malic Acid, was contrary to the Food Safety

Act, which adopted the FFDCA and accompanying regulations.

134. The FFDCA and its regulations prohibit consumer deception by companies in the labeling of food. Fla. Stat. § 501.203(3)(c).

135. Plaintiff believed the taste of the Product's fruit filling was only from the identified ingredients of apples, cinnamon and natural flavorings, even though it contained added artificial flavoring in the form of DL-Malic Acid.

136.  Plaintiff paid more for the Product and would not have paid as much if she knew that in addition to apples, cinnamon and natural flavorings, the filling's taste was from added artificial flavoring in the form of DL-Malic Acid.

137. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under FDUTPA, by paying more for it than she otherwise would have.

138. Plaintiff will produce evidence showing how she and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

139. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

**COUNT II**
<u>False and Misleading Adverting,</u>
<u>Fla. Stat. § 817.41</u>

140. Plaintiff incorporates by reference paragraphs 1-64.

141. Defendant made misrepresentations and omissions of material fact, that the taste of the Product's filling was only from the identified ingredients of apples, cinnamon and natural flavorings, even though it contained added artificial flavoring in the form of DL-Malic Acid, through its advertisements and marketing in various forms of media, packaging and descriptions, and targeted digital and/or print advertising.

142. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

143. Plaintiff paid more for the Product, as she would not have paid as much if she knew that the taste of the Product's filling was not only from the identified ingredients of apples, cinnamon and natural flavorings, but added artificial flavoring in the form of DL-Malic Acid,

144. Defendant knew these statements and omissions were false and/or misleading.

145. Defendant intended for consumers to rely on its false statements and omissions for the purpose of selling the Product.

146. Plaintiff and class members did in fact rely upon these statements and omissions.

147. Reliance was reasonable and justified because of Market Pantry's

reputation as a trusted name, with products honestly marketed to consumers.

148. As a result of Defendant's misrepresentations and omissions, Plaintiff and class members suffered damages in the price premium paid for the Product, which is the difference between what she paid and how much it would have been sold for without the false and misleading representations and omissions identified here.

## COUNT III
Unjust Enrichment

149. Plaintiff incorporates by reference paragraphs 1-64.

150. Defendant received benefits and monies because it represented to Plaintiff and consumers that the taste of the Product's filling was only from the identified ingredients of apples, cinnamon and natural flavorings, even though it contained added artificial flavoring in the form of DL-Malic Acid.

151. Principles of equity and good conscience prohibit Defendant from retaining profits made from the sale of the Product.

152. Plaintiff seeks disgorgement of such profits and establishment of a constructive trust on behalf of the Class.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and

the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   December 6, 2023

Respectfully submitted,

/s/ William Wright
The Wright Law Office P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

William Wright

The Wright Law Office P.A.

Sheehan & Associates P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiff*